UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NANCY A. BOYNTON AND <br> PATRICIA BEEKES <br>     Plaintiffs <br><br> Vs. <br><br> FEDERAL HOUSING FINANCE <br> AGENCY, FEDERAL NATIONAL <br> MORTGAGE ASSOCIATION, AND <br> SANTANDER BANK, N.A. <br>     Defendants | Civil Action No. |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF, AND DAMAGES

*Introduction*

1. Plaintiffs, Nancy A. Boynton and Patricia Beekes, are or were the co-owners of real property located at 4 Cassisi Court, North Providence, Rhode Island ("Property"), which has been and continues to be their primary residence. Through this action Plaintiffs challenge the lawfulness of the foreclosure sale of their residence which was conducted on August 5, 2014, by certain Defendants: The Federal National Mortgage Association ("FNMA" or "Fannie Mae"), an agency or instrumentality of the federal government; Fannie Mae's conservator and regulator, the Federal Housing Finance Agency ("FHFA"), a federal agency; and Santander Bank, N.A. ("Santander") acting as an agent of Fannie Mae and FHFA. Plaintiffs seek declaratory relief, injunctive relief, damages, and other relief from this Court, because Defendants Fannie Mae, FHFA, and Santander acted jointly to deprive Plaintiffs of their interest in the Property by conducting a foreclosure sale without providing them with adequate notice and an opportunity for a meaningful hearing, as required by the Due

Process clause of the Fifth Amendment to the Constitution of the United States, and other laws, and caused harm to them in various other ways hereinafter stated.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action and all defendants pursuant to 28 U.S.C. § 1331, because this case arises under the Constitution and laws of the United States.

3. This Court also has jurisdiction over this action and all defendants pursuant to 28 U.S.C. § 1332 because the parties in this case are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

4. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5. The principal events giving rise to the claims stated herein occurred in this district and venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(c)(2).

6. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. Rule 57.

## THE PARTIES

7. The Plaintiffs Nancy A. Boynton and Patricia Beekes are citizens of the United States who reside at 4 Cassisi Court, North Providence, RI 02904 ("Property").

8. The Federal Housing Finance Agency ("FHFA") is an independent agency of the United States Federal Government established pursuant to 12 U.S.C. § 4511 *et seq.*

9. The Federal National Mortgage Association ("FNMA" and "Fannie Mae") is a corporation organized under the laws of the United States by special charter, to serve the important governmental objectives of providing stability in the secondary

mortgage market, responding appropriately to the private capital market, providing ongoing assistance to the secondary market for residential mortgages, promoting access to mortgage credit throughout the nation by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing, and managing and liquidating federally owned mortgage portfolios in an orderly manner, with a minimum of adverse effect upon the residential mortgage market and minimum loss to the Federal Government. See 12 U.S.C. § 1716.

10. Santander Bank, N.A. ("Santander") is organized as a national banking association under the laws of the United States. It became a national banking association on January 26, 2012. Santander's corporate headquarters are located in Boston, Massachusetts. Santander also identifies Wilmington, Delaware as its principal place of business.

## GENERAL FACTUAL ALLEGATIONS

### *The Conservatorship of FHFA over Fannie Mae*

11. In accordance with the Housing and Economic Recovery Act of 2008 ("HERA"), the federal government established FHFA as a federal agency to supervise and regulate Fannie Mae and affiliated entities, the Federal Home Loan Mortgage Corporation ("Freddie Mac") and affiliated entities, and any Federal Home Loan Bank. See 12 U.S.C. §§ 4502 (20), 4511(b)(2).

12. Among the powers the federal government granted to the FHFA pursuant to HERA was the power of its Director to place Fannie Mae into conservatorship under the FHFA and the power of the FHFA to operate and control all of Fannie Mae's

operations as its conservator.

13. On or about September 7, 2008, the Director of the FHFA placed Fannie Mae under the conservatorship of the FHFA. See Statement of FHFA Director James B. Lockhart, http://www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf , accessed May 12, 2014. (Attached as Exhibit 1).

14. In January 2010, the Congressional Budget Office (hereafter "CBO") concluded that the actions taken by FHFA to place Fannie Mae under conservatorship "[made Fannie Mae . . . part of the government and [implied] that [its] operations should be reflected in the federal budget." Budgetary Treatment of Fannie Mae and Freddie Mac, (Congressional Budget Office Background Paper, 2010), available at www.cbo.gov/publications/41887 (Attached as Exhibit 2) at pages 1, 6.

15. In 2010, the CBO estimate projected cost of the federal government's investment in Fannie Mae between 2009 and 2019 at $389 billion. See Exhibit 2 at page 9.

16. In 2013, the CBO again concluded, "the federal government is now the effective owner of [Fannie Mae], any gain or loss arising from a change in the way the distressed mortgages are handled by [Fannie Mae] would ultimately accrue to taxpayers." See Options for Principal Forgiveness in Mortgages Involving Fannie Mae and Freddie Mac (Congressional Budget Office, Mitchell Remy & Damien Moore, Working Paper No. 2013-02) available at www.cbo.gov/publication/44114 (Attached as Exhibit 3) at page 1.

17. As conservator, FHFA controls all of the powers of the shareholders and board of directors of Fannie Mae. See Federal National Mortgage Association, Annual Report,

Form 10-K, for the fiscal year ended December 31, 2014

http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2014/10k_2014.pdf , attached as Exhibit 4, at page 25, 162, 166. Shareholders no longer vote for members of Fannie Mae's board of directors, or on any other matters. See Exhibit 4 at page 25, 166.

18. On November 24, 2008, FHFA reconstituted Fannie Mae's Board of Directors, appointed all nine (9) members of the Board as well as the Board Chairman, and delegated certain powers to the Board while reserving certain powers to itself. See Exhibit 4 at page 162.

19. FHFA may modify or terminate the delegation of authority to the Board at FHFA's discretion. Exhibit 4 at page 162.

20. Fannie Mae's directors serve on behalf of the conservator FHFA and exercise their authority as directed by and with the approval, where required of the conservator. The directors have no fiduciary duties to any person or entity except to the conservator FHFA. Accordingly, the directors are not obligated to consider the interest of the company, the holders of equity or debt securities unless specifically directed to do so by the conservator FHFA. See Exhibit 4 at 25, 162.

21. As a result of the conservatorship, Fannie Mae is not managed with a strategy to maximize shareholder returns. See Exhibit 4 at page 25, 52. FHFA, as both conservator and regulator, and the United States Treasury, pursuant to the senior preferred stock purchase agreement, prohibits Fannie Mae from paying any dividends to common shareholders. See Exhibit 4 at page 52. The net income of Fannie Mae is not available to common stockholders. See Exhibit 4 at page 52.

22. According to the FHFA's September 7, 2008 explanation of the conservatorship, there is "no exact time frame that can be given as to when this conservatorship may end." FHFA's conservatorship of Fannie Mae will end, according to said explanation, when the Director of FHFA issues an order terminating the conservatorship, after the Director determines that FHFA's "plan to restore the Company to a safe and solvent condition has been completed successfully." See FHFA, Questions and Answers on Conservatorship, (Sept. 7, 2008), available at http://www.treasury.gov/press-center/press-releases/Documents/fhfa_consrv_faq_090708hp1128.pdf. (Attached as Exhibit 5) at page 2; See also Exhibit 4 at page 1 ("Our conservatorship has no specified termination date, and we do not know when or how the conservatorship with terminate, whether we will continue to exist following conservatorship, what changes to our business structure will be made during or following the conservatorship, or what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.").

23. As a result of FHFA's conservatorship of Fannie Mae, since September 6, 2008, and continuing now and for the foreseeable future, FHFA directly controls and operates Fannie Mae with all the powers of the shareholders, directors, and officers of Fannie Mae, owns title to all the assets of Fannie Mae, and conducts all business of Fannie Mae. See Exhibit 4 at Page 25.

24. HERA does contain a provision automatically terminating FHFA's conservatorship of Fannie Mae, namely if FHFA's director appoints FHFA as receiver of Fannie Mae. *See* 12 U.S.C. 4617(a)(4)(D). However, FHFA's control over Fannie Mae will not be terminated upon its being appointed as receiver. There is no other law, regulation,

policy or directive that provides either a date or specifies conditions by which FHFA's control over Fannie Mae will terminate.

25. Even if the conservatorship were terminated by means other than the appointment of FHFA as receiver of Fannie Mae, Fannie Mae will remain subject to the control of the United States Treasury through the senior preferred stock purchase agreement, senior preferred stock, and warrant to purchase common stock, which can only be canceled or modified with the consent of the United States Treasury. See Exhibit 4 at 51.

26. On or about September 7, 2008, as restated on or about September 26, 2008, Fannie Mae entered into a senior preferred stock purchase agreement, as amended, with the United States Treasury. Pursuant to the senior preferred stock purchase agreement, Fannie Mae transferred to the United States Treasury 1,000,000 shares of preferred stock, senior in right for both dividends and liquidation to all other preferred or common stock of Fannie Mae, with an initial liquidation preference of $1,000.00 per share; a warrant to purchase 79.9% of the common stock of Fannie Mae at a nominal price; and certain restrictions on Fannie Mae's ability to issue new shares, declare dividends, or dispose of assets without the approval of the United States Treasury; in exchange for the commitment of the United States Treasury to extend up to $100 billion (later amended to $200 billion) to maintain the liquidity of Fannie Mae. See Amended and Restated Senior Preferred Stock Purchase Agreement, dated September 26, 2008, available at http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-26_SPSPA_FannieMae_RestatedAgreement_N508.pdf, attached as Exhibit 6; see also Exhibit 4 at Page 26.

27. From 2009 through the first quarter of 2012, Fannie Mae received a total of $116.1 billion from Treasury under the senior preferred stock purchase agreement to maintain a zero net worth. Because the senior preferred stock had an initial liquidation preference of $1 billion, the current aggregate liquidation preference in favor of the United States Treasury for the senior preferred stock is $117.1 billion. See Exhibit 4 at page 11.

28. The United States Treasury owns 100% of the senior preferred stock of Fannie Mae, and holds warrants to purchase 79.9% of the common stock of Fannie Mae at a nominal price on a fully diluted basis on the date of exercise. See Exhibit 4 at page 26, 27; see also Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-8-7_SPSPA_FactSheet_508.pdf attached as Exhibit 7.

29. By virtue of the senior preferred stock purchase agreement, as amended, the United States Treasury is entitled to receive quarterly dividends equal to the entire net worth of Fannie Mae, which results in every dollar of earnings being paid to the United States Treasury. See Exhibit 4 page 27, 52. Similarly, Fannie Mae is not permitted to retain earnings, rebuild a capital position, or pay dividends or other distributions to stockholders other than the United States Treasury. See Exhibit 4 at page 2.

30. Including the 2014 dividend payments to the United States Treasury, Fannie Mae will have paid a total of $134.5 billion in dividends to Treasury on the senior preferred stock. However, under the terms of the senior preferred stock purchase agreement, dividend payments do not offset prior Treasury draws, and, therefore, the Treasury's

ownership interest in Fannie Mae is not diminished by reason of the dividends. See Exhibit 4 at page 2, 11.

31. Pursuant to the senior preferred stock purchase agreement, Fannie Mae is not permitted to redeem the senior preferred stock prior to the termination of the United States Treasury's funding commitment, which commitment will not terminate until all of Fannie Mae's liabilities have been satisfied. See Exhibit 4 at page 25, 115.

32. The CBO considers the payments from Fannie Mae to the United States Treasury as "intragovernmental payments, which to not affect net federal outlays." See Exhibit 2 at page 3.

33. Because Fannie Mae was chartered by Congress to further governmental objectives related to the secondary mortgage market and national housing policies, because the federal government maintains a substantial ownership interest in Fannie Mae, because Fannie Mae is substantially funded by the federal government, because the Board of Directors of Fannie Mae is entirely appointed by FHFA, and because Fannie Mae is under the control of FHFA and/or the United States Treasury, Fannie Mae is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the federal government by the United States Constitution. See DOT v. Ass'n of Am. R.R., 135 S. Ct. 1225, 1232-1233 (U.S. 2015); Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995).

*The Agency Relationship between FHFA and Fannie Mae and Santander.*

34. Fannie Mae purchases mortgages that meet its underwriting standards from originators such as banks or thrifts. Fannie Mae holds these mortgages in its retained portfolios or packages them into mortgage-backed securities that it sells to investors.

See FHFA Office of Inspector General Evaluation Report, <u>FHFA's Oversight of the Servicing Alignment Initiative</u>, February 12, 2014, available at http://fhfaoig.gov/Content/Files/EVL-2014-003.pdf (attached as Exhibit 8) at page 6.

35. For the mortgages that Fannie Mae purchases, Fannie Mae enters into contracts with mortgage servicers, including the "Servicing Guide" and other agreements. Under the terms of these agreements, the servicer collects mortgage payments, sets aside taxes and insurance premiums in escrow, forwards interest and principal payments to the contractually designated party, and responds to payment defaults. Exhibit 8 at Page 8.

36. Through the "Servicing Guide" and other agreements, Fannie Mae established certain requirements for its servicers to follow when it performs its servicing duties, which include specific instructions on mitigating losses after borrowers default and conducting foreclosures on behalf of Fannie Mae. See Exhibit 8 at pages 8-9.

37. After FHFA placed Fannie Mae into conservatorship, FHFA has engaged in continuous supervision of Fannie Mae's oversight of its servicers, including Santander. See FHFA Office of Inspector General, <u>FHFA's Supervision of Freddie Mac's Control's over Mortgage Servicing Contractors</u>, March 7, 2012, available at http://fhfaoig.gov/Content/Files/AUD%202012-001_0.pdf (Attached as Exhibit 9) at Pages 19-20. FHFA's Office of Inspector General describes "continuous supervision" as "a wide range of ongoing activities designed to monitor and analyze [Fannie Mae's] overall business profile, including any trends or associated emerging risks." See Exhibit 9 at page 20.

38. Among other supervisory actions, in April, 2011, FHFA created the Servicer Alignment Initiative, as amended by four additional initiatives beginning in January

2012 (collectively, "SAI"), by which the FHFA directs the actions taken by Fannie Mae's mortgage servicers when servicing a delinquent mortgage loan, in order to maximize the financial benefits to Fannie Mae, and ultimately to the taxpayers. See Exhibit 8 at Pages 9-11.

39. Through the SAI, the FHFA directed Fannie Mae to update its servicing guidelines by adding new standards and timelines by which servicers were to manage delinquent mortgages. See Exhibit 8 at page 10.

40. Through the SAI, the FHFA created specific requirements for servicers to follow including state-level timelines for the processing of foreclosures from the date of referral to the attorney/trustee through the date of the foreclosure sale. See Exhibit 8 at page 10.

41. Through the SAI, the FHFA has directed Fannie Mae's servicers to use non-judicial foreclosure procedures, which authorize the seizure of property without a pre-deprivation hearing as required by the Due Process Clause of the Fifth Amendment.

*The Plaintiffs' interest in the Property*

42. On or about July 29, 2002, the Plaintiffs became the owners of the Property as joint tenants by the Warranty Deed from Matthew A. Bucci, which deed is recorded with the land records of the Town of North Providence on July 29, 2002 at Book 682 and Page 288. The deed is attached as Exhibit 10.

43. On or about July 18, 2007, the Plaintiffs borrowed $165,000.00 from Sovereign Bank ("Originating Lender"), which was evidenced by a promissory note (the "Note") on the same date.

44. On or about the same date, the Note was secured by a mortgage ("Mortgage") in favor of the Originating Lender. The Mortgage was recorded on July 23, 2007 in the land records of the Town of North Providence at Book 2426 and Page 262. The Mortgage is attached as Exhibit 11.

45. On April 6, 2010, Sovereign Bank purported to assign its interest in the Mortgage to Federal National Mortgage Association by an assignment recorded on April 20, 2010 in the land records for the Town of North Providence at Book 2648 and Page 220. See Exhibit 12.

### *The foreclosure proceedings against the Property*

46. In early 2014, Santander referred the Plaintiffs' Mortgage account to Harmon Law Offices, P.C. to commence foreclosure proceedings.

47. The Plaintiffs did not receive a notice of the foreclosure sale.

48. The Plaintiffs also did not receive any correspondence from the Defendants concerning the possibility of a mediation conference as described in Rhode Island General Laws § 34-27-3.2

49. On or about August 5, 2014, Fannie Mae conducted a foreclosure sale of the Property, in which it presented the only bid in the amount of $ 216,043.67.

50. On October 23, 2014, Fannie Mae, by Santander as Attorney in Fact, signed a document (hereinafter referred to as "the Foreclosure Deed" without prejudice as to its legal effect), which was recorded on October 31, 2014 in the land records for the Town of North Providence at Book 2968 and Page 67. The Foreclosure Deed is attached as Exhibit 13.

51. Neither Santander, Fannie Mae, nor FHFA have provided the Plaintiffs an opportunity for an evidentiary hearing with Fannie Mae or FHFA at which the Plaintiffs could have an opportunity to confront and cross-examine persons who supplied information upon which the foreclosure action is grounded; present arguments and evidence to dispute the allegations of Santander, Fannie Mae, and FHFA prior to the termination of their interest in the Property; be represented by counsel during a hearing prior to the termination of their interest in the Property; and to have a neutral informal hearing officer make a determination based on applicable law and the evidence adduced at a hearing prior to the termination of the Plaintiffs' interest in the Property.

52. Had the Plaintiffs had an opportunity for a hearing, they could have presented evidence to challenge the foreclosure in one or more of the following ways:
    a. Fannie Mae was not the mortgagee on the date of the foreclosure sale.
    b. Fannie Mae failed to provide the required foreclosure notices to the Plaintiff and to comply with Rhode Island foreclosure statutes, including § 34-27-3.2.
    c. Fannie Mae failed to act in good faith as required by common law and § 34-27-3.2.
    d. Fannie Mae failed to properly notify the Plaintiffs of a foreclosure sale.
    e. Fannie Mae added amounts to the mortgage account that the Plaintiffs did not owe.

53. On or about March 13, 2015, the Defendant Fannie Mae filed a complaint for eviction against the Plaintiffs in Third Division District Court, Kent County, Rhode Island.

54. If the eviction action is not enjoined, Plaintiffs will suffer irreparable harm, in that the Plaintiffs will lose possession of their primary residence and they currently have no other place to reside.

## COUNT I – DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS

55. Plaintiffs reallege and incorporate paragraphs 1-54 by reference.

56. Fannie Mae, and FHFA acted jointly to deprive the Plaintiffs of their ownership rights in the Property by conducting a foreclosure sale pursuant to Rhode Island General Laws Chapter 34-27, entitled "Mortgage Foreclosure and Sale," which authorizes mortgagees to foreclose the rights of an equitable title holder without judicial process or the opportunity to be heard before the foreclosure sale.

57. When used by a federal government actor, the procedures of Rhode Island General Laws Chapter 34-27 do not satisfy the Due Process Clause of the Fifth Amendment before depriving an owner of his or her property. Specifically, Chapter 34-27 does not provide for adequate notice, an opportunity to be heard before the deprivation of property, or the opportunity to recover appropriate damages for an improper deprivation of property.

58. Pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution, Fannie Mae and FHFA, as agencies and/or instrumentalities of the federal government, owed a higher degree of notice and hearing to Plaintiffs than is provided by Rhode Island General Laws chapter 34-27 before depriving the Plaintiffs of their property.

59. The Plaintiffs have a significant property interest at stake. The foreclosure, if allowed to stand, permanently deprives the Plaintiffs of their ownership, possession, and use

of the Property, which they use as their primary residence; clouds the title to the Property; impairs their ability to sell, rent, or otherwise alienate the Property; taints their credit rating; reduces the chance of their obtaining a future loan or mortgage; subjected them to eviction; and jeopardizes their security in a dwelling place.

60. There is a significant risk of an erroneous deprivation of the Plaintiffs' interest through the procedures used by Fannie Mae, and FHFA pursuant to RI General Laws chapter 34-27. To prevent an erroneous deprivation of property, the Due Process Clause of the Fifth Amendment to the United States Constitution requires Fannie Mae, and FHFA to provide Plaintiffs with an opportunity to be heard at a meaningful time on, *inter alia,* any challenge to the true ownership of the Note; any challenge to Fannie Mae's and/or FHFA's authority to foreclose on behalf of the owner of the Note; any challenge to Fannie Mae's and/or FHFA's determination of default under the Note and Fannie Mae's and/or FHFA's calculation of deficiency; any challenge to Fannie Mae's and/or FHFA's determination that the Plaintiffs are not eligible for a loan modification, a repayment, or other homeowner assistance option; the opportunity to refinance or reinstate through other sources of funding; whether Fannie Mae and/or FHFA acted in good faith; and any challenge to Fannie Mae's and/or FHFA's compliance with applicable notice procedures.

61. The government's financial interest in obtaining ownership, possession, and use of the Property is minimal.

62. There are no exigent circumstances that would justify the lack of a pre-deprivation hearing, nor would a meaningful hearing before a neutral party impose significant fiscal or administrative burdens.

63. Fannie Mae and FHFA violated the Plaintiffs' Fifth Amendment procedural due process rights by conducting a non-judicial foreclosure sale pursuant to Rhode Island General Laws Chapter 34-27 without first providing adequate notice, a meaningful hearing prior to the deprivation of property, and an opportunity to recover adequate damages.

WHEREFORE, The Plaintiffs respectfully request the Court to grant the following relief:

1) A declaration that the Fannie Mae's and FHFA's use of non-judicial foreclosure process in Rhode Island General Laws Chapter 34-27-4 (b), or any foreclosure process that does not provide for adequate notice, a meaningful evidentiary hearing prior to the deprivation of property, and an opportunity to recover damages, violated the Plaintiffs' due process rights under the Fifth Amendment to the Constitution of the United States;

2) A declaration that the foreclosure sale of the Plaintiffs' Property on August 5, 2014, was invalid and void;

3) A declaration that the foreclosure deed recorded on October 31, 2014, in the land records for the Town of North Providence at Book 2968 and Page 67, is invalid and void;

4) A preliminary injunction and permanent injunction enjoining Fannie Mae and FHFA from foreclosing on the Plaintiffs' Property through the use the non-judicial foreclosure process in Rhode Island General Laws Chapter 34-27-4 (b), or any other foreclosure process that does not provide adequate notice, a meaningful hearing prior to the deprivation of property, and an opportunity to recover

damages if the foreclosure is deemed erroneous;

6) A temporary injunction, a preliminary injunction and a permanent injunction enjoining Fannie Mae from evicting the Plaintiffs and members of Plaintiffs' household from the Property;

7) A preliminary injunction and permanent injunction requiring Defendants to execute and cause to be recorded a deed correcting and voiding the aforementioned foreclosure deed and quitting their claim to the Property back to Plaintiffs.

8) An order quieting title and declaring the rights and interests of all parties in the Property;

9) Costs; and

10) Such other and further relief as the court considers appropriate.

**PLAINTIFFS DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

Nancy A. Boynton and
Patricia Beekes
By Their Attorneys,


/s/ Jeffrey C. Ankrom, Esq.
Jeffrey C. Ankrom, Esq. (#7663)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 138
(401) 453-0310 fax
jankrom@rils.org


/s/ Steven Fischbach, Esq.
Steven Fischbach, Esq. (#3259)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 182
(401) 453-0310 fax
sfischbach@rils.org

Dated: August 20, 2015