# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

NANCY A. BOYNTON AND      |
PATRICIA BEEKES      |
    **Plaintiffs**      |
     |
    **Vs.**      |      **Civil Action No.**
     |
**FEDERAL HOUSING FINANCE**      |
**AGENCY, FEDERAL NATIONAL**      |
**MORTGAGE ASSOCIATION, AND**      |
**SANTANDER BANK, N.A.**      |
    **Defendants**      |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a temporary restraining order and preliminary injunction enjoining Defendants Federal Housing Finance Agency ("FHFA") and the Federal National Mortgage Association ("Fannie Mae") from evicting Plaintiffs and from selling or otherwise disposing of Plaintiffs' primary residence located at 4 Cassisi Court, North Providence, RI pending further order of the Court.  The eviction action is currently pending in Rhode Island District Court, case number 3CA-2015-1890, and has been scheduled for a **trial on August 25, 2015**. However, Plaintiffs have a substantial likelihood of success of prevailing on their legal claims against FHFA and Fannie Mae.  Without the requested injunctive relief, Plaintiffs stand to lose their primary residence through an erroneous deprivation of their property without due process of law due to Defendants' failure to provide Plaintiffs a pre-foreclosure hearing where alternatives to foreclosure could be fully aired and considered.

## BACKGROUND

### *The Conservatorship of FHFA over Fannie Mae*

In accordance with the Housing and Economic Recovery Act of 2008 ("HERA"), the federal government established FHFA as a federal agency to supervise and regulate Fannie Mae and affiliated entities, the Federal Home Loan Mortgage Corporation ("Freddie Mac") and affiliated entities, and any Federal Home Loan Bank. See 12 U.S.C. §§ 4502 (20), 4511(b)(2); Complaint ¶11. Among the powers the federal government granted to the FHFA pursuant to HERA was the power of its Director to place Fannie Mae into conservatorship under the FHFA and the power of the FHFA to operate and control all of Fannie Mae's operations as its conservator. See Complaint ¶12. On or about September 7, 2008, the Director of the FHFA placed Fannie Mae under the conservatorship of the FHFA. See Statement of FHFA Director James B. Lockhart, http://www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf , accessed May 12, 2014. See Complaint ¶ 13; Exhibit 1. In January 2010, the Congressional Budget Office (hereafter "CBO") concluded that the actions taken by FHFA to place Fannie Mae under conservatorship "[made Fannie Mae . . .  part of the government and [implied] that [its] operations should be reflected in the federal budget." Budgetary Treatment of Fannie Mae and Freddie Mac, (Congressional Budget Office Background Paper, 2010), available at www.cbo.gov/publications/41887 (Attached to the Complaint as Exhibit 2) at pages 1, 6.

As conservator, FHFA controls all of the powers of the shareholders and board of directors of Fannie Mae. See Federal National Mortgage Association, Annual Report, Form 10-K, for the fiscal year ended December 31, 2014 http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2014/10k_2014.pdf ,

attached to the Complaint as Exhibit 4, at page 25, 162, 166. Shareholders no longer vote for members of Fannie Mae's board of directors, or on any other matters. See Complaint Exhibit 4 at page 25, 166. On November 24, 2008, FHFA reconstituted Fannie Mae's Board of Directors, appointed all nine (9) members of the Board as well as the Board Chairman, and delegated certain powers to the Board while reserving certain powers to itself. See Complaint Exhibit 4 at page 162. FHFA may modify or terminate the delegation of authority to the Board at FHFA's discretion. See Complaint Exhibit 4 at page 162. Fannie Mae's Directors serve on behalf of the conservator FHFA and exercise their authority as directed by and with the approval, where required of the conservator. The Directors have no fiduciary duties to any person or entity except to the conservator FHFA. Accordingly, the Directors are not obligated to consider the interest of the company, the holders of equity or debt securities unless specifically directed to do so by the conservator FHFA. See Complaint Exhibit 4 at 25, 162. As a result of the conservatorship, Fannie Mae is not managed with a strategy to maximize shareholder returns. See Complaint Exhibit 4 at page 25, 52. FHFA, as both conservator and regulator, and the United States Treasury, pursuant to the senior preferred stock purchase agreement, prohibits Fannie Mae from paying any dividends to common shareholders. See Complaint Exhibit 4 at page 52. The net income of Fannie Mae is not available to common stockholders. See Complaint Exhibit 4 at page 52.

As a result of FHFA's conservatorship of Fannie Mae, since September 6, 2008, and continuing now and for the foreseeable future, FHFA directly controls and operates Fannie Mae with all the powers of the shareholders, directors, and officers of Fannie Mae, owns title to all the assets of Fannie Mae, and conducts all business of Fannie Mae.  See Complaint Exhibit 4 at Page 25. HERA does contain a provision automatically terminating FHFA's conservatorship of Fannie

3

Mae, namely if FHFA's director appoints FHFA as receiver of Fannie Mae.  See 12 U.S.C.

4617(a)(4)(D).  However, FHFA's control over Fannie Mae will not be terminated upon its being

appointed as receiver.  There is no other law, regulation, policy or directive that provides either a

date or specifies conditions by which FHFA's control over Fannie Mae will terminate.

      Even if the conservatorship were terminated by means other than the appointment of

FHFA as receiver of Fannie Mae, Fannie Mae will remain subject to the control of the United

States Treasury through the senior preferred stock purchase agreement, senior preferred stock,

and warrant to purchase common stock, which can only be canceled or modified with the consent

of the United States Treasury. See Complaint Exhibit 4 at 51. On or about September 7, 2008, as

restated on or about September 26, 2008, Fannie Mae entered into a senior preferred stock

purchase agreement, as amended, with the United States Treasury. Pursuant to the senior

preferred stock purchase agreement, Fannie Mae transferred to the United States Treasury

1,000,000 shares of preferred stock, senior in right for both dividends and liquidation to all other

preferred or common stock of Fannie Mae, with an initial liquidation preference of $1,000.00 per

share; a warrant to purchase 79.9% of the common stock of Fannie Mae at a nominal price; and

certain restrictions on Fannie Mae's ability to issue new shares, declare dividends, or dispose of

assets without the approval of the United States Treasury; in exchange for the commitment of the

United States Treasury to extend up to $100 billion (later amended to $200 billion) to maintain

the liquidity of Fannie Mae. See Amended and Restated Senior Preferred Stock Purchase

Agreement, dated September 26, 2008, available at

http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-

26_SPSPA_FannieMae_RestatedAgreement_N508.pdf, attached to the Complaint as Exhibit 6;

see also Complaint Exhibit 4 at Page 26. From 2009 through the first quarter of 2012, Fannie

4

Mae received a total of $116.1 billion from Treasury under the senior preferred stock purchase agreement to maintain a zero net worth. Because the senior preferred stock had an initial liquidation preference of $1 billion, the current aggregate liquidation preference in favor of the United States Treasury for the senior preferred stock is $117.1 billion. See Complaint Exhibit 4 at page 11.

By virtue of the senior preferred stock purchase agreement, as amended, the United States Treasury is entitled to receive quarterly dividends equal to the entire net worth of Fannie Mae, which results in every dollar of earnings being paid to the United States Treasury.  See Complaint Exhibit 4 page 27, 52. Similarly, Fannie Mae is not permitted to retain earnings, rebuild a capital position, or pay dividends or other distributions to stockholders other than the United States Treasury. See Complaint Exhibit 4 at page 2. Including the 2014 dividend payments to the United States Treasury, Fannie Mae will have paid a total of $134.5 billion in dividends to Treasury on the senior preferred stock. However, under the terms of the senior preferred stock purchase agreement, dividend payments do not offset prior Treasury draws, and, therefore, the Treasury's ownership interest in Fannie Mae is not diminished by reason of the dividends. See Complaint Exhibit 4 at page 2, 11. Pursuant to the senior preferred stock purchase agreement, Fannie Mae is not permitted to redeem the senior preferred stock prior to the termination of the United States Treasury's funding commitment, which commitment will not terminate until all of Fannie Mae's liabilities have been satisfied.

### *The Agency Relationship between FHFA and Fannie Mae and Santander.*

Fannie Mae purchases mortgages that meet its underwriting standards from originators such as banks or thrifts. Fannie Mae holds these mortgages in its retained portfolios or packages them into mortgage-backed securities that it sells to investors. See FHFA Office of Inspector

General Evaluation Report, <u>FHFA's Oversight of the Servicing Alignment Initiative</u>, February 12, 2014, available at <u>http://fhfaoig.gov/Content/Files/EVL-2014-003.pdf</u> (attached to the Complaint as Exhibit 8) at page 6. For the mortgages that Fannie Mae purchases, Fannie Mae enters into contracts with mortgage servicers, including the "Servicing Guide" and other agreements. Under the terms of these agreements, the servicer collects mortgage payments, sets aside taxes and insurance premiums in escrow, forwards interest and principal payments to the contractually designated party, and responds to payment defaults. Complaint Exhibit 8 at Page 8. Through the "Servicing Guide" and other agreements, Fannie Mae established certain requirements for its servicers to follow when it performs its servicing duties, which include specific instructions on mitigating losses after borrowers default and conducting foreclosures on behalf of Fannie Mae. See Complaint Exhibit 8 at pages 8-9.

After FHFA placed Fannie Mae into conservatorship, FHFA has engaged in continuous supervision of Fannie Mae's oversight of its servicers, including Santander.  See FHFA Office of Inspector General, <u>FHFA's Supervision of Freddie Mac's Control's over Mortgage Servicing Contractors</u>, March 7, 2012, available at <u>http://fhfaoig.gov/Content/Files/AUD%202012-001_0.pdf</u> (Attached to the Complaint as Exhibit 9) at Pages 19-20. FHFA's Office of Inspector General describes "continuous supervision" as "a wide range of ongoing activities designed to monitor and analyze [Fannie Mae's] overall business profile, including any trends or associated emerging risks." See Complaint Exhibit 9 at page 20. Among other supervisory actions, in April, 2011, FHFA created the Servicer Alignment Initiative, as amended by four additional initiatives beginning in January 2012 (collectively, "SAI"), by which the FHFA directs the actions taken by Fannie Mae's mortgage servicers when servicing a delinquent mortgage loan, in order to maximize the financial benefits to Fannie Mae, and ultimately to the taxpayers. See Complaint

Exhibit 8 at Pages 9-11. Through the SAI, the FHFA directed Fannie Mae to update its servicing guidelines by adding new standards and timelines by which servicers were to manage delinquent mortgages. See Complaint Exhibit 8 at page 10. Through the SAI, the FHFA created specific requirements for servicers to follow including state-level timelines for the processing of foreclosures from the date of referral to the attorney/trustee through the date of the foreclosure sale. See Complaint Exhibit 8 at page 10. Through the SAI, the FHFA has directed Fannie Mae's servicers to use non-judicial foreclosure procedures, which authorize the seizure of property without a pre-deprivation hearing as required by the Due Process Clause of the Fifth Amendment.

### The Plaintiff's interest in the Property

On or about July 29, 2002, the Plaintiffs became the owners of the Property as joint tenants by the Warranty Deed from Matthew A. Bucci, which deed is recorded with the land records of the Town of North Providence on July 29, 2002 at Book 682 and Page 288. The deed is attached to the Complaint as Exhibit 10. See Declaration of Nancy A. Boynton (hereinafter "Boynton Decl.") at ¶ 2. On or about July 18, 2007, the Plaintiffs borrowed $165,000.00 from Sovereign Bank ("Originating Lender"), which was evidenced by a promissory note (the "Note") on the same date. See Boynton Decl. at ¶3. On or about the same date, the Note was secured by a mortgage ("Mortgage") in favor of the Originating Lender. The Mortgage was recorded on July 23, 2007 in the land records of the Town of North Providence at Book 2426 and Page 262. The Mortgage is attached to the Complaint as Exhibit 11. See Boynton Decl. at ¶ 4. On April 6, 2010, Sovereign Bank purported to assign its interest in the Mortgage to Federal National Mortgage Association by an assignment recorded on April 20, 2010 in the land records for the Town of North Providence at Book 2648 and Page 220. See Complaint Exhibit 12. See Boynton Decl.

at ¶ 5.

### The foreclosure proceedings against the Property

In early 2014, Santander referred the Plaintiffs' Mortgage account to Harmon Law

Offices, P.C. to commence foreclosure proceedings. The Plaintiffs did not receive a notice of the

foreclosure sale. See Boynton Decl. at ¶6. The Plaintiffs also did not receive any correspondence

from the Defendants concerning the possibility of a mediation conference as described in Rhode

Island General Laws § 34-27-3.2. See Boynton Decl. at ¶7. On or about August 5, 2014, Fannie

Mae conducted a foreclosure sale of the Property, in which it presented the only bid in the

amount of $ 216,043.67. On October 23, 2014, Fannie Mae, by Santander as Attorney in Fact,

signed a document (hereinafter referred to as "the Foreclosure Deed" without prejudice as to its

legal effect), which was recorded on October 31, 2014 in the land records for the Town of North

Providence at Book 2968 and Page 67. The Foreclosure Deed is attached to the Complaint as

Exhibit 13.

Neither Santander, Fannie Mae, nor FHFA have provided the Plaintiffs an opportunity for

an evidentiary hearing with Fannie Mae or FHFA at which the Plaintiffs could have an

opportunity to confront and cross-examine persons who supplied information upon which the

foreclosure action is grounded; present arguments and evidence to dispute the allegations of

Santander, Fannie Mae, and FHFA prior to the termination of their interest in the Property; be

represented by counsel during a hearing prior to the termination of their interest in the Property;

and to have a neutral informal hearing officer make a determination based on applicable law and

the evidence adduced at a hearing prior to the termination of the Plaintiffs' interest in the

Property. Had the Plaintiffs had an opportunity for a hearing, they could have presented evidence

to challenge the foreclosure in one or more of the following ways:

    a.   Fannie Mae was not the mortgagee on the date of the foreclosure sale.

    b.   Fannie Mae failed to provide the required foreclosure notices to the Plaintiff and to

        comply with Rhode Island foreclosure statutes, including § 34-27-3.2.

    c.   Fannie Mae failed to act in good faith as required by common law and § 34-27-3.2.

    d.   Fannie Mae failed to properly notify the Plaintiffs of a foreclosure sale.

    e.   Fannie Mae added amounts to the mortgage account that the Plaintiffs did not owe.

On or about March 13, 2015, the Defendant Fannie Mae filed a complaint for eviction against the Plaintiffs in Third Division District Court, Kent County, Rhode Island. The eviction case is currently scheduled for a trial on August 25, 2015. See Boynton Decl. at ¶10.

If the eviction action is not enjoined, Plaintiffs will suffer irreparable harm, in that the Plaintiffs will lose possession of their primary residence and they currently have no other place to reside.  See Boynton Decl. at ¶11.

## STANDARD OF LAW

"[I]n determining whether to grant a preliminary injunction, the district court must consider the following factors: first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the nonmovant if enjoined compared to the hardship to the movant if injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest." *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14-15 (1st Cir. 2009).

## ARGUMENT

Defendant Fannie Mae is currently controlled by and operated for the benefit of the United States Government, as a result of being placed in conservatorship on or about September 7, 2008 by Defendant FHFA, an agency of the United States.  Since Fannie Mae is a corporation

controlled and operated by an agency of the United States, Fannie Mae's actions are the actions of FHFA; and Fannie Mae's/FHFA's  actions to foreclose on mortgages it owns and/or insures, must be accomplished in accordance with the United States Constitution.  The Due Process clause of the Fifth Amendment requires agencies and instrumentalities of the United States to provide a homeowner with notice and an opportunity for a hearing before depriving a delinquent borrower of his or her property through foreclosure.

I.      **Reasonable Likelihood of Success on the Merits**

The Plaintiffs have a reasonable likelihood of prevailing in this action. The Defendants' imminent foreclosure of the Plaintiffs' Property violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

A viable procedural due process claim must demonstrate a "deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' . . . without due process of law." *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 32 (1st Cir. 1996)  (citing *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir. 1992).  Plaintiffs have a reasonable likelihood of proving that both FHFA and Freddie Mac are agents or instrumentalities of the federal government subject to the Fifth Amendment of the Constitution, and further that the Due Process Clause requires a hearing prior to depriving Plaintiffs of a protected property in their primary residence through foreclosure.

A.      **FHFA is an Agent or Instrumentality of the Federal Government.**

There can be little doubt that FHFA is an agency or instrumentality of the federal government.  FHFA was established by Congress as part of HERA as "an independent agency of the Federal Government." 12 U.S.C. §4511.  *See, also, Fed. Hous. Fin. Agency v. Countrywide*

*Fin. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.)*, 900 F. Supp. 2d 1055, 1066 (C.D. Cal. 2012) ("HERA created FHFA as an agency of the United States, given that it is not 'subject to the direction or supervision of any other agency of the United States,' 12 U.S.C. § 4617(a)(7)"); *Nevada v. Countrywide Home Loans Servicing, LP*, 812 F. Supp. 2d 1211, (D. Nev. 2011) ("[T]he Court finds that the Federal Housing Finance Agency ('FHF') is an independent agency of the federal government who has authority over Fannie Mae."); *Leon Cnty., Florida v. Fed. Hous. Fin. Agency*, 816 F. Supp. 2d 1205, (N.D. Fla. 2011) ("The Federal Housing Finance Agency ('FHFA') is a federal agency that has duties both as a regulator, and, since 2008, as the conservator of the Federal National Mortgage Association ('Fannie Mae") and Federal Home Loan Mortgage Corporation ('Freddie Mac')"); *In re Fannie Mae 2008 Securities Litigation*, Nos. 08 Civ. 7831(PAC), 09 Civ. 1352(PAC), 2009 U.S. Dist. LEXIS 109888, 2009 WL 4067266, at *1 (S.D.N.Y. Nov. 24, 2009) [*8] ("FHFA is an agency of the United States Government and acts as the conservator for Fannie Mae."); *Williams v. Timothy F. Geithner*, Civil No. 09-1959 ADM/JJG, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009) ("FHFA is a federal agency that supervises and regulates housing finance and also serves as the Conservator for Fannie Mae and Freddie Mac."); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 791 (E.D.Va. 2009) (describing FHFA as "the federal agency acting as conservator of Freddie Mac pursuant to the Housing and Economic Recovery Act of 2008").

FHFA is likely to argue that when acting as conservator of Fannie Mae it is not acting in a governmental capacity. This argument was rejected by at least one court, which ruled that "FHFA is a federal agency even when acting as conservator or receiver . . . ." *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.)*, 900 F. Supp. 2d 1055, 1066 (C.D. Cal. 2012) (citing  12 U.S.C. § 4617(a)(7): "[w]hen acting as

11

conservator or receiver, the Agency shall not be subject to the direction or supervision of any

other agency of the United States or any State in the exercise of the rights, powers, and privileges

of the Agency.")  Moreover, FHFA, in a brief to the Second Circuit Court of Appeals Cited this

very ruling to support the agency's argument that it was not acting as a private party:

> . . . [F]or purposes of statutory interpretation, FHFA is not simply a "private" party, as two other courts overseeing actions by FHFA have found. *See FHFA v. Royal Bank of Scot. Grp. PLC*, 2012 WL 3580522, at *4 (D. Conn. Aug. 17, 2012) ("the fact that a federal agency has stepped into the shoes of a person who would be a private plaintiff does not convert the federal agency into a private plaintiff"); ***Countrywide*, Add.41 ("FHFA is a federal agency even when acting as conservator");** cf. SPA83-84 (giving deference to the views of FHFA, "a public agency charged by Congress," that a stay of proceedings pending appeal would not benefit the public).
>
> *Federal Hous. Fin. Agency v. UBS Americas Inc.*, 2012 U.S. 2nd Cir. Briefs 3207 at 56 n.15 (2d Cir. Oct. 25, 2012)  (emphasis added).

### B.      Fannie Mae is an agent or instrumentality of the federal government.

In *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995), the United

States Supreme Court promulgated a two part test for determining whether a government created

corporation such as Fannie Mae is considered an instrumentality of the federal government and,

thus, required to abide by the provisions of the United States Constitution.  The central question

in *Lebron* was whether the National Railroad Passenger Corporation ("Amtrak") could restrict

the content of an advertising display without infringing on Plaintiff's constitutional rights under

the First Amendment. Justice Scalia, writing for an eight member majority, analyzed "the long

history of corporations created and participated in by the United States for the achievement of

governmental objectives." *Id.*, at 386.  The charter of many government-controlled corporations,

including Amtrak, contain explicit statements that the corporation is a private entity and not a

government entity. The *Lebron* Court held that the designation as a private entity does not affect

the court's determination of whether the constitution applies to the entity:

We have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit, see *Sentner v. Amtrak*, 540 F.Supp. 557, 560 (NJ 1982), and of the ordinarily presumed power of Government agencies authorized to incur obligations to pledge the credit of the United States, see, e. g., Debt Obligations of Nat. Credit Union Admin., 6 Op. Off. Legal Counsel 262, 264 (1982). But it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions.

*Id.*, at 392.

Based on established precedent, the Court held that Amtrak was subject to the constitution, and set forth this general two part test: "We hold that where, as here, the Government [1] creates a corporation by special law, for the furtherance of governmental objectives, and [2] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.*, at 400.

This past term the United States Supreme Court revisited the *Lebron* ruling in a case challenging Congress' delegation of rulemaking powers to Amtrak. *Dept. of Transportation v. Ass'n of American Railroads*, 135 S. Ct. 1225; 191 L. Ed. 2d 153 (hereinafter referred to as *DOT*). In the *DOT* case, the Supreme Court was called upon to rule whether Amtrak was a governmental entity for purposes of the Fifth Amendment's Due Process Clause and constitutional provisions regarding separation of powers. Relying largely on it's prior ruling in *Lebron, the DOT* Court in an 8-1 decision[1] concluded:

*Lebron* teaches that for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status.

---

[1] Justice Thomas wrote a separate opinion in the *DOT* case concurring in the judgment but noted Amtrak's status as a governmental entity was not dispositive as to whether Congress' delegation of powers to Amtrak was constitutional: "An entity that 'was created by the Government, is controlled by the Government, and operates for the Government's benefit,' [] but that is not properly constituted to exercise a power under one of the [Constitution's] Vesting Clauses, is no better qualified to be a delegatee of that power than is a purely private one." *DOT, supra,* at 1253 (quoting the majority opinion in the *DOT* case at 1232).

> [] The political branches created Amtrak, control its Board, define its mission,
> specify many of its day-to-day operations, have imposed substantial transparency
> and accountability mechanisms, and for all practical purposes, set and supervise
> its annual budget.
>
> *DOT, supra,* at 1233.

Notably absent from the *DOT*'s Court's analysis of Amtrak's status as a federal actor or

instrumentality is the duration of the government's control.

Neither the *Lebron* court nor the *DOT* court specifically analyzed mortgage related

corporations established by Congress such as Fannie Mae, Freddie Mac, or the Government

National Mortgage Association ("Ginnie Mae").  Prior to *Lebron*, many courts held that

Fannie Mae and Freddie Mac were private entities for purposes of resolving challenges to the

use of non-judicial foreclosure.  *See, e.g., Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 357-

9 (5th Cir. 1977) (pre-conservatorship Fannie Mae is not government agency; use of non-

judicial foreclosure is not governmental action subject to the due process clause); *Northrip v.*

*FNMA*, 527 F.2d 23 (6th Cir. 1975) (same); *FNMA v. Scott*, 548 F.W.2d 545 (MO 1977) (en

banc), app.dis. 436 U.S. 924 (1978); *but see Samuel T. Isaac & Assoc. v. FNMA*, 647 S.W.2d

495 (Ky.App. 1982) (upholding trial court's findings that Fannie Mae was a federal agency

and that "FNMA's conduct of business is so entwined with government policies that it

assumes the character of government action," thereby requiring due process for termination of

a mortgage banker's contract).

After *Lebron* and prior to the conservatorship no court of appeals has considered whether

Fannie Mae was subject to the constitution, but one court of appeals did consider whether

Freddie Mac was subject to the constitution.  *See American Bankers Mortg. Corp. v. Federal*

*Home Loan Mortg. Corp.*, 75 F.3d 1401 (9th Cir. 1996).  In *American Bankers*, the Court found

that Freddie Mac satisfied the first prong of the *Lebron* test, ruling that "Freddie Mac's purposes

14

are "federal governmental objectives" for the purpose of analyzing whether or not Freddie Mac is

a government entity." *Id.*, at 1407 (citing *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132, 1141

(7th Cir. 1992)).   However, the Court found that Freddie Mac failed to meet *Lebron's* second

prong (hereafter, "authority test"), because at that time the U.S. government was entitled to

appoint fewer than one-third of Freddie Mac's directors (five out of eighteen total board

members), as opposed to a majority of the board as required by *Lebron*.  *Id.*

As a result of FHFA's conservatorship and the United States Treasury's ownership of

Fannie Mae stock, Fannie Mae clearly is subject to extensive government control, equivalent to

or greater than the government's control over Amtrak analyzed by the *Lebron* court[2] and the

*DOT c*ourt.  As conservator, FHFA controls all of the powers of the shareholders and board of

directors of Fannie Mae. See Federal National Mortgage Association, Annual Report, Form 10-

K, for the fiscal year ended December 31, 2014

http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2014/10k_2014.pdf ,

---

[2] The Lebron decision recounted the government's control over Amtrak as follows:

> The Rail Passenger Safety Act provides that Amtrak's board of directors consists of nine members, six of whom are appointed directly by the President of the United States. The Secretary of Transportation, or his designee, sits ex officio. [45 USC] §543(a)(1)(A). The President appoints three more directors with the advice and consent of the Senate, [45 USC] §543(a)(1)(C), selecting one from a list of individuals recommended by the Railway Labor Executives Association, [45 USC] §543(a)(1)(C)(i), one "from among the Governors of States with an interest in rail transportation," [45 USC] §543(a)(1)(C)(ii), and one as a "representative of business with an interest in rail transportation," [45 USC] §543(a)(1)(C)(iii). These directors serve 4-year terms. 45 USC §543(a)(2)(A). The President appoints two additional directors without the involvement of the Senate, choosing them from a list of names submitted by various commuter rail authorities. [45 USC] §543(a)(1)(D). These directors serve 2-year terms.[45 USC] §543(a)(2)(B). The holders of Amtrak's preferred stock select two more directors, who serve 1-year terms. [§ 45 USC] §543(a)(1)(E). Since the United States presently holds all of Amtrak's  preferred stock, which it received (and still receives) in exchange for its subsidization of Amtrak's  perennial losses, see [45 USC] §544(c), the Secretary of Transportation selects these two directors. The ninth member of the board is Amtrak's president, [45 USC] §543(a)(1)(B), who serves as the chairman of the board, [45 USC] §543(a)(4), is selected by the other eight directors, and serves at their pleasure, [45 USC] §543(d).  Amtrak's four private shareholders have not been entitled to vote in selecting the board of directors since 1981.

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 385-386 (U.S. 1995)

15

attached to the Complaint as Exhibit 4, at page 25, 162, 166. Shareholders no longer vote for members of Fannie Mae's board of directors, or on any other matters. See Complaint Exhibit 4 at page 25, 166. On November 24, 2008, FHFA reconstituted Fannie Mae's Board of Directors, appointed all nine (9) members of the Board as well as the Board Chairman, and delegated certain powers to the Board while reserving certain powers to itself. See Complaint Exhibit 4 at page 162. FHFA may modify or terminate the delegation of authority to the Board at FHFA's discretion. See Complaint Exhibit 4 at page 162. Fannie Mae's Directors serve on behalf of the conservator FHFA and exercise their authority as directed by and with the approval, where required of the conservator. The Directors have no fiduciary duties to any person or entity except to the conservator FHFA. Accordingly, the Directors are not obligated to consider the interest of the company, the holders of equity or debt securities unless specifically directed to do so by the conservator FHFA. See Complaint Exhibit 4 at 25, 162. As a result of the conservatorship, Fannie Mae is not managed with a strategy to maximize shareholder returns. See Complaint Exhibit 4 at page 25, 52. FHFA, as both conservator and regulator, and the United States Treasury, pursuant to the senior preferred stock purchase agreement, prohibits Fannie Mae from paying any dividends to common shareholders. See Complaint Exhibit 4 at page 52. The net income of Fannie Mae is not available to common stockholders. See Complaint Exhibit 4 at page 52. The federal government has provided financial subsidies to Fannie Mae that far exceed the subsidies to Amtrak. In 2010, the CBO estimate projected cost of the federal government's investment in Fannie Mae between 2009 and 2019 at $389 billion. See Complaint; Exhibit 2 at page 9.

Further, Fannie Mae is operated entirely for the benefit of the United States Treasury, as the United States Treasury is entitled to receive quarterly dividends equal to the entire net worth

of Fannie Mae, which results in every dollar of earnings being paid to benefit the United States
Treasury. See Complaint Exhibit 4 page 27, 52.  The United States Treasury owns 100% of the
senior preferred stock of Fannie Mae, and holds warrants to purchase 79.9% of the common
stock of Fannie Mae at a nominal price on a fully diluted basis on the date of exercise. See
Complaint Exhibit 4 at page 26, 27; see also Fact Sheet: Treasury Senior Preferred Stock
Purchase Agreement http://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-
Agree/2008-8-7_SPSPA_FactSheet_508.pdf attached to the Complaint as Exhibit 7. Including
the 2014 dividend payments to the United States Treasury, Fannie Mae will have paid a total of
$134.5 billion in dividends to Treasury on the senior preferred stock. However, under the terms
of the senior preferred stock purchase agreement, dividend payments do not offset prior Treasury
draws, and, therefore, the Treasury's ownership interest in Fannie Mae is not diminished by
reason of the dividends. See Complaint Exhibit 4 at page 2, 11. Pursuant to the senior preferred
stock purchase agreement, Fannie Mae is not permitted to redeem the senior preferred stock (and
thereby reduce the federal government's ownership of Fannie Mae) prior to the termination of
the United States Treasury's funding commitment, which commitment will not terminate until all
of Fannie Mae's liabilities have been satisfied. See Complaint Exhibit 4 at page 25, 115. The
CBO considers the payments from Fannie Mae to the United States Treasury as
"intragovernmental payments, which do not affect net federal outlays." See Complaint Exhibit 2
at page 3.

FHFA's complete control over Fannie Mae stems from the authority granted to FHFA by
Congress in the Housing and Economic Recovery Act of 2008 (hereafter, "HERA").  Under
HERA, FHFA "as conservator or receiver, and by operation of law . . . "succeed[ed] to all rights,
titles, powers, and privileges of [Fannie Mae], and of any stockholder, officer, or director of

17

[Fannie Mae] with respect to [Fannie Mae] and [its] assets." 12 U.S.C. § 4617(b)(2)(A)(i).

Similarly, HERA provides that FHFA has the right to "take over the assets of and operate

[Fannie Mae] with all the powers of the shareholders, the directors, and the officers of the

regulated entity and conduct all business of the regulated entity." 12 U.S.C. § 4617(b)(2)(B)(i).

Moreover, pursuant to HERA, FHFA "may, by regulation or order, provide for the exercise of

any function by any stockholder, director, or officer of any regulated entity for which the Agency

has been named conservator or receiver."  12 U.S.C. §4617(b)(2)(C).  Courts construing the

powers Congress conferred on FHFA by HERA ruled that HERA vested FHFA with complete

control over Fannie Mae and another government sponsored enterprise, Freddie Mac.  *See Fed.*

*Hous. Fin. Agency v. City of Chicago*, 2013 U.S. Dist. LEXIS 119987, at *32-33 (N.D. Ill. Aug.

23, 2013) ("HERA's provisions make it clear that, in the event Fannie and Freddie were placed

into conservatorships, Congress intended FHFA to assume complete control of those regulated

entities and, in its discretion, 'take such action as may be necessary to put the regulated entity in

a sound and solvent condition.'") (quoting 12 U.S.C. §4617(b)(2)(D)(i)); *Oakland County v.*

*Fannie Mae*, 276 F.R.D. 491, 495 (E.D. Mich. 2011) ("These provisions [of HERA] make clear

that Congress intended to grant the [FHFA] the right to exercise plenary control over Fannie

Mae.");  *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 797 (E.D.

Va. 2009) ("This language [in HERA] clearly demonstrates Congressional intent to transfer as

much control of Freddie Mac as possible to the FHFA . . . .").

FHFA and Fannie Mae will likely argue that because conservatorship, "by [its] nature [is]

temporary, the government has not acceded to permanent control over the entity and [Fannie

Mae] remains a private corporation."  *See Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 96 (D.D.C.

2012).  However, the *Herron* Court erred by focusing its analysis on the characteristics of the

form of entity chosen by Congress, a conservatorship, whose duration will end at some

unspecified time but will not last forever. The *DOT* and *Lebron* courts rejected this approach,

requiring instead a determination as to whether the entity in question, in whatever forms chosen

by Congress, is what the Constitution regards as the government:

> [I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions. If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment. **The Constitution constrains governmental action "by whatever instruments or in whatever modes that action may be taken." Ex parte Virginia, 100 U.S. 339, 346-347, 25 L. Ed. 676 (1880). And under whatever congressional label.** As we said of the Reconstruction Finance Corporation in deciding whether debts owed it were owed the United States Government: "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is . . . ." Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539, 90 L. Ed. 835, 66 S. Ct. 729 (1946).

> *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392-393 (1995) (emphasis added).

Under the reasoning of *Herron,* Congress could establish conservatorship entities

completely controlled by the government and with indefinite duration as a means of avoiding

compliance with the United States Constitution.  This outcome would not be permissible under

*Lebron*, as demonstrated by replacing reference to the corporate form with conservatorship in the

following excerpt from the *Lebron* decision:

> It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the [conservatorship] form. On that thesis, *Plessy v. Ferguson,* 163 U.S. 537, 41 L. Ed. 256, 16 S. Ct. 1138 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned [conservatorship entity.]

> *Lebron v. Nat'l R.R. Passenger Corp*., 513 U.S. 374, 397 (1995).

Moreover. the *DOT* Court affirmed the *Lebron* Court's analysis of Amtrak's status as a

governmental actor, without any reference to the duration of the government's control: "*Lebron*

teaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status." See *DOT*, 135 S. Ct. at 1233.

Second, the *Herron* court completely overlooked that part of *Lebron's* authority test which requires that the entity in question have an expressly stated date or set of circumstances under which full voting control by the government will cease in order for the entity to become disqualified as a governmental actor.  In *Lebron,* the Court compared Amtrak to the Consolidated Rail Corporation, or Conrail, the latter of which the Court had previously determined not to be a federal instrumentality because "[f]ull voting control . . . will shift to the [private] shareholders if federal obligations fall below 50% of Conrail's indebtedness."  *Id.*, at 399 (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974)).  In *Lebron*, Justice Scalia distinguished Amtrak from Conrail in finding the former was an instrumentality of the United States, noting that "… no provision exists that will automatically terminate control [of Amtrak by the federal government] upon termination of a temporary financial interest." *Lebron*, 513 U.S. at 399.[3] Further, because the *DOT* case restated the *Lebron* analysis without considering at all the duration of federal control, the present "practical reality of federal control and supervision" should be dispositive as to Fannie Mae's status as a governmental entity, not Congress' imposition of federal control via a conservatorship entity, that by its nature is not of permanent duration. *DOT*, 135 S. Ct. at 1233. The *Herron* Court, which was decided before *DOT,* overlooks this requirement altogether, again focusing on the alleged temporary nature of the type of entity

---

[3] In footnote 5 of the *Lebron decision*, Justice Scalia considered one section of Amtrak's charter that appeared to allow for release of control from the government after a certain condition was met, but found that it was too ambiguous to be relied upon.  513 U.S. at 399 n.5.

chosen by Congress to run Fannie Mae: "[a]lthough the duration of the conservatorship is

indefinite, FHFA's control over [Fannie Mae] is temporary." *Herron*, 857 F. Supp. 2d at 95.

FHFA's "temporary" control over Fannie Mae has already lasted almost seven years;

and, like Amtrak, that control will not end on a specified date or under specified predetermined

circumstances.   HERA does contain a provision automatically terminating FHFA's

conservatorship of Fannie Mae, namely if FHFA's director appoints FHFA as receiver of Fannie

Mae.  *See* 12 U.S.C. 4617(a)(4)(D).  However, FHFA's control over Fannie Mae will not

terminate upon its being appointed as receiver.  There is no other law, regulation, policy or

directive that provides either a date or specifies conditions by which FHFA's control over Fannie

Mae will terminate.  Moreover, according to the FHFA's September 7, 2008 explanation of the

conservatorship, there is "no exact time frame that can be given as to when this conservatorship

may end." FHFA's conservatorship of Fannie Mae will end, according to said explanation, when

the Director of FHFA issues an order terminating the conservatorship, after the Director

determines that FHFA's "plan to restore the Company to a safe and solvent condition has been

completed successfully." Complaint ¶22 and Complaint Exh. 5 at page 2.  HERA's lack of an

automatic termination of FHFA's control over Fannie Mae gives FHFA, whether as conservator

or receiver, permanent control over Fannie Mae, as defined by the *Lebron* court.

Even assuming that the conservatorship is considered temporary by its very nature, the

federal government's control over Fannie Mae will not end solely as a result of the termination

of the conservatorship, because United States Treasury's ownership of Fannie Mae's stock is

permanent and will give the Treasury permanent control over Fannie Mae.  Thus, were FHFA's

conservatorship terminated by means other than the appointment of FHFA as receiver of Fannie

Mae, Fannie Mae will remain subject to the control of the United States Treasury through the

SPSPA, senior preferred stock, and warrant to purchase common stock, which can only be canceled or modified with the consent of the United States Treasury. *See* Complaint ¶25, and Complaint, Exh. 4 at 51. Pursuant to the SPSPA, Fannie Mae is not permitted to redeem the senior preferred stock prior to the termination of the United States Treasury's funding commitment, which commitment will not terminate until all of Fannie Mae's liabilities have been satisfied. *See* Complaint ¶31 and Complaint, Exh. 4 at page 25, 115. *See, also,* Discussion, *supra*, at 16-17.

Finally, the *Herron* Court incorrectly interpreted *Lebron's* authority test as requiring the government's authority to appoint a majority of the directors of the corporation to last forever. This was error as such authority could **always** be changed over time, and the *Lebron* decision recognizes as much, ruling that the government's control of Amtrak was permanent, even though Congress had expressly reserved for itself the power to change the composition of the board of Amtrak:

> It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. But any reduction in the immediacy of accountability for Amtrak  directors vis-a-vis regulatory commissioners seems to us of minor consequence for present purposes -- especially since, by the very terms of the chartering Act, Congress's "right to repeal, alter, or amend this chapter at any time is expressly reserved." 45 U.S.C. § 541.

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 398 (1995).

In summary, *Lebron's* authority test is satisfied, where, as here, government control over the federally created corporation's board of directors is complete and of indefinite duration.  Like Amtrak, Fannie Mae is "created by the Government, is controlled by the Government, and operates for the Government's benefit." See *DOT*, 135 S.Ct. at 1232.

Fannie Mae and FHFA will also likely argue that FHFA's conservatorship of Fannie Mae did not convert Fannie Mae into an instrumentality of the federal government, since FHFA, as conservator, "steps into the shoes" of Fannie Mae, which would otherwise be considered a private entity. *See, Herron,* 857 F. Supp. 2d at 94. ("[W]hen it serves as a conservator or receiver of a private entity, FHFA when it serves as conservator "step[s] into the shoes" of the private corporation, Fannie Mae."). *Herron* was not followed by the District Court for the Central District of California, which within months of the *Herron* decision ruled that "FHFA is a federal agency even when acting as conservator or receiver . . . ." *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.)*, 900 F. Supp. 2d 1055, 1066 (C.D. Cal. 2012).

The "stepping into the shoes" metaphor is NOT appropriate for use in a case alleging unconstitutional conduct on the part of a federal agency, whether or not it is acting in a receivership or conservatorship capacity, as the metaphor was utilized to help resolve a conflict of law question involving a federal agency acting as receiver in pursuit of a claim arising out of the pre-receivership conduct of a failed financial institution. *Herron's* "shoes" metaphor derives from the Supreme Court's decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), where the Court ruled that the Federal Deposit Insurance Corporation (hereafter, "FDIC"), acting as receiver of a failed savings and loan institution, "steps into the shoes" of the institution and obtained the rights "of the insured depository institution" that existed prior to receivership. *O'Melveny*, 512 U.S. at 86. *O'Melveny* involved a lawsuit alleging professional negligence and breach of fiduciary duty brought by FDIC against a law firm which represented a failed savings and loan pre-receivership. The central issue was whether California law was preempted because the FDIC was suing as receiver. The Court held that because FDIC had stepped into the shoes of

the failed savings and loan institution, the FDIC's claims against the law firm would be adjudicated under state law and, consequently, California law had not been pre-empted.

*O'Melveny* does not stand for the proposition that when the FDIC – or any other federal entity – is a receiver, the federal entity becomes a private actor for all purposes.[4]  Significantly, four months prior to deciding *O'Melveny* the U.S. Supreme Court decided a case where constitutional claims were asserted against the FDIC acting as receiver, as Plaintiff does in this action.  In *FDIC v. Meyer*, 510 U.S. 471 (U.S. 1994), a case brought by an employee of a failed savings and loan institution against the Federal Savings and Loan Insurance Corporation (hereafter, FSLIC)[5] as receiver of the institution, the Supreme Court did not apply the "stepping into the shoes" metaphor to defeat the employee's *Bivens* claim brought under the Fifth Amendment for lack of governmental action.  Instead, the Supreme Court ruled that the agency's "sue and be sued" clause in its enabling statute constituted a waiver of sovereign immunity, an issue only applicable to governmental actors.  *Id.*, at 583.  Despite finding that FDIC's sovereign immunity had not been waived, the Court refused to recognize a *Bivens* damages claim against the agency as a *Bivens* damage remedy was intended to deter individual conduct as opposed to

---

[4] FHFA concedes this point in a brief submitted to the Second Circuit Court of Appeals, where FHFA argues that *O'Melveney's* "stepping into the shoes" rule did not convert FHFA into a private litigant for purposes of statutory construction:

> Moreover, for purposes of statutory interpretation, FHFA is not simply a "private" party, as two other courts overseeing actions by FHFA have found. *See FHFA v. Royal Bank of Scot. Grp. PLC*, 2012 WL 3580522, at *4 (D. Conn. Aug. 17, 2012) ("the fact that a federal agency has stepped into the shoes of a person who would be a private plaintiff does not convert the federal agency into a private plaintiff"); *Countrywide*, Add.41 ("FHFA is a federal agency even when acting as conservator"); cf. SPA83-84 (giving deference to the views of FHFA, "a public agency charged by Congress," that a stay of proceedings pending appeal would not benefit the public).

> *Federal Hous. Fin. Agency v. UBS Americas Inc*., 2012 U.S. 2nd Cir. Briefs 3207 at 56 n.15 (2d Cir. Oct. 25, 2012)

[5] The Federal Deposit Insurance Corporation ("FDIC") is FSLIC's statutory successor.  *FDIC v. Meyer*, 510 U.S. 471, 474 (1994).

agency conduct, and for fear that "a direct action for damages against federal agencies [ ] would [] creat[e] a potentially enormous financial burden for the Federal Government." *Id.*, at 486.

Further evidence that the *Herron* Court wrongly applied *O'Melveny*'s "stepping into the shoes" metaphor to constitutional claims is found in *O'Melveny's* citation of *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, (1989), another case where the Supreme Court noted that FSLIC, a government receiver for a failed financial institution, stepped into the shoes of the failed institution.[6]   As with *O'Melveny*, the Court used the "stepping into the shoes" metaphor to resolve a claim that arose out of the pre-receivership conduct of the failed financial institution taken over by the government receiver.  In *Coit,* the Supreme Court decided not to reach the plaintiff's due process and Seventh Amendment challenges to FSLIC's decision to adjudicate the plaintiff's state law claims, as opposed to ruling that such claims did not lie against FSLIC because FSLIC "stepped into the shoes" of a failed savings and loan and, thus, was not a governmental actor.  *Coit,* 489 U.S. at 578.

The U.S. Supreme Court rulings in *Coit* and *Meyer* demonstrate that constitutional claims are not defeated for lack of government action when leveled against federal agencies acting as receiver such as FSLIC, FDIC and FHFA. Therefore, following the framework set forth in *Lebron*, and *DOT*, because Fannie Mae is under the complete control of FHFA, Fannie Mae should be considered part of the federal government for the purpose of the Due Process Clause of the Fifth Amendment of the United States' Constitution.

---

[6] "Once FSLIC is appointed receiver of an insolvent savings and loan association, FSLIC steps into the shoes of the association and takes control of its assets." *Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp.*, 489 U.S. 561, 571 (1989).

### C.     The Due Process Clause requires a hearing prior to a foreclosure.

Since Defendants FHFA and Fannie Mae, as instrumentalities of the United States, are

required to comply with the constitutionally mandated guarantees of due process, the Court must

next analyze what process is due to the Plaintiffs before FHFA and Fannie Mae can deprive

Plaintiffs of their property.  The First Circuit in *Reardon v. United States*, 947 F.2d 1509 (1st Cir.

1991) articulated the scope of that analysis, following precedent established by the U.S. Supreme

Court:

> The Supreme Court has established a two-part analysis of due process challenges to statutes which, like this one, involve property rather than liberty interests. One must first ask whether the statute authorizes the taking of a "significant property interest" protected by the fifth amendment. E.g., *Fuentes v. Shevin*, 407 U.S. 67, 86, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972). If there is no significant property interest involved, the inquiry is at an end. If there is, one proceeds to examine what process is due in the particular circumstances. *E.g., id.; Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

> *Reardon v. United States*, 947 F.2d 1509, 1517-1518 (1st Cir. Mass. 1991).

### 1.     Plaintiffs have a significant property interest in their home.

There can be little doubt that Plaintiffs have a significant property interest in their home.

In *Connecticut v. Doehr*, 501 U.S. 1 (1991), a unanimous Court held that a Connecticut

attachment statute violated the due process clause because the statutorily authorized attachment

lien placed on plaintiff Doehr's real property deprived him of a significant property interest

within the meaning of the due process clause. The *Doehr* Court stated: "For a property owner

like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the

property; taints any credit rating; reduces the chance of obtaining a home equity loan or

additional mortgage; and can even place an existing mortgage in technical default where there is

an insecurity clause." *Doehr*, 501 U.S. at 11.  The *Doehr* Court concluded that "even the

temporary or partial impairments to property rights that attachments, liens, and similar

encumbrances entail are sufficient to merit due process protection." *Id.*, at 12.   Similarly, in a

case challenging the federal government's seizure of real property without providing the owner

notice and an opportunity to be heard, the U.S. Supreme Court observed:

> [The owner's] right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance. The seizure deprived [the owner] of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents. . . . The seizure of a home produces a far greater deprivation than the loss of furniture, or even attachment. It gives the Government not only the right to prohibit sale, but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property.

> *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1993) (citations omitted.)

> *See also Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983) ("[A] mortgagee

clearly has a legally protected property interest . . . ."); *Fuentes v. Shevin*, 407 U.S. 67, 84 (1972)

(" . . . possessory interests in . . . chattels . . . were within the protection of the Fourteenth

Amendment.") *McCachren v. United States Dep't of Agriculture*, *Farmers Home Admin.*, 599

F.2d 655, 656 (5th Cir. Miss. 1979) ("The equity of a debtor in realty has been held to be a

"significant property interest" entitled to due process protection."); *United States v. Whitney*, 602

F. Supp. 722, 732 (W.D.N.Y. 1985) ("[A] mortgagor 'possesses a substantial property interest

that is significantly affected by a foreclosure sale.'" (citing *Mennonite Bd. of Missions v. Adams*,

462 U.S. 791, 798 (1983)); *Matzke v. Block*, 564 F. Supp. 1157, 1164 (D. Kan. 1983), *aff'd in

part, reversed in part*, 732 F.2d 799 (10th Cir. 1984); ("foreclosure of a United States lien in real

property or chattels is a government action which affects a debtor's property interest and,

therefore, must be accomplished in accordance with due process under the Fifth Amendment.");

*Rau v. Cavenaugh*, 500 F. Supp. 204, 206 (D.S.D. 1980) ("Plaintiff's interest in her FmHA

financed home is a property interest protected by the fifth amendment.");  *United States v.*

*White*, 429 F. Supp. 1245, 1250 (N.D. Miss. 1977) ("[T]here can be no doubt that the ownership as well as the right to occupy government-subsidized housing is a property interest protected by the Fifth Amendment."); *Ricker v. United States*, 417 F. Supp. 133, 138 (D. Me. 1976) ("The Government's foreclosure [of their farm] thus clearly deprived plaintiffs of an interest in property protected by the Fifth Amendment."); *Law v. United States Dep't of Agriculture*, 366 F. Supp. 1233, 1238 (N.D. Ga. 1973) ("Plaintiff's equity interest in the land and the right to its 'use' would constitute property entitled to procedural due process.")

> 2.       Due Process Requires that Plaintiffs Be Afforded An Opportunity to Be Heard Prior to the Government's Foreclosure of Their Home.

Having established that a significant property interest is at stake, Plaintiffs now address what procedures are due under the Due Process Clause of the Fifth Amendment, using the three part inquiry set forth in *Connecticut v. Doehr*:

> That inquiry requires a court to balance 'the private interest that will be affected by the official action'; 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards'; and lastly 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'

> *Reardon v. United States*, *supra,* 947 F.2d at 1518 (quoting *Connecticut v. Doehr*, *supra*, at 10.)

> a.)       The Private Interest Affected

The private interest at stake in this matter is Plaintiffs' primary home which, as noted above, is a significant property interest accorded protection by the Due Process Clause. *See* Discussion, *supra*, at 26-28.   Plaintiffs stand to lose their home as a result of the foreclosure sale conducted by Fannie Mae and the subsequent eviction action filed against Plaintiffs' household.

> b.)       Risk of Erroneous Deprivation and Probable Value of Additional Safeguards

The use of non-judicial foreclosure involves a significant risk of erroneous deprivation of property due to the lack of procedures whereby the Plaintiffs could challenge the Defendants' compliance with state foreclosure laws and errors that the Defendants made when considering alternatives to foreclosure prior to a foreclosure sale.

Under Rhode Island law, in general[7], a mortgagee can divest a property owner in default on a mortgage that contains a statutory power of sale clause by conducting a foreclosure sale upon written notice to the owner, without any opportunity for the owner to be heard.  R.I. Gen. Laws §34-27-4.  Before conducting the foreclosure sale the mortgagee must advertise the sale in a public newspaper at least 28 days before the foreclosure sale and run the advertisement for three consecutive weeks, with the third advertisement published between 7 and 14 days of the sale date stated in the first advertisement; and also, the mortgagee must provide written notice of the foreclosure sale by certified mail to the owner 30 days in advance of the publication of the first advertisement.  § 34-27-4 (a)-(b).

The risk of erroneous deprivation occurs precisely due to the absence of any opportunity to be heard before a foreclosure sale.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo,* 380 U. S. 545, 552, (1965)).  In the instant case, had the Plaintiffs had an opportunity for a hearing, they could have presented evidence to challenge that Santander and Fannie Mae failed to comply with Rhode Island General Laws § 34-27-3.2, failed to provide required notices, claimed additional amounts that the Plaintiffs did not owe, and failed to act in good faith. See Boynton Decl. at ¶ 9.

---

[7] There are slightly different requirements for notification by publication when a foreclosure sale is adjourned pursuant to R.I. Gen. Laws §34-11-12.

The Supreme Court's admonition of the importance of an opportunity to be heard before a property owner is deprived of property through forfeiture proceedings is equally applicable to deprivations of property through the use of non-judicial foreclosure proceedings:

> The purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decision-making. **That protection is of particular importance here where the Government has a direct pecuniary interest in the outcome of the proceeding.** See *Harmelin v. Michigan*, 501 U.S. 957, 979, n. 9 (1991) (opinion of Scalia, J.) ("[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit"). Moreover, the availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure. Given the congested civil dockets in federal courts, a claimant may not receive an adversary hearing until many months after the seizure. And even if the ultimate judicial decision is that the claimant was an innocent owner, or that the Government lacked probable cause, this determination, coming months after the seizure, "would not cure the temporary deprivation that an earlier hearing might have prevented." *Doehr,* 501 U.S., at 15.
>
> *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55-56 (1993) (emphasis added, footnote omitted.)

The consequences of an erroneous deprivation of property through foreclosure are fairly severe, given the absence of protections accorded foreclosed borrowers under Rhode Island law. For example, Rhode Island provides no right to redeem the property after a foreclosure sale. *See In re Medaglia*, 402 B.R. 530 (Bankr. D.R.I. 2009).  Post foreclosure, former owners are considered tenants at sufferance under Rhode Island law and are subject to an action for eviction after written notice by the grantee under a foreclosure deed. *See Noorigan v. Greenfield*, 156 A.2d 515 (R.I. 1931); R.I. Gen. Laws § 34-18.1-2.  Lastly, residential borrowers have no protection from deficiency assessments after a foreclosure of a mortgage in Rhode Island.  Given that Rhode Island has a ten year statute of limitations on contracts, R.I. Gen. Laws §9-1-13, and a twenty year statute of limitations on contracts under seal, R.I. Gen. Laws §9-1-17, a claim of deficiency can impair a residential borrower's finances for a very long time.  In the event of a surplus owed to the homeowner after a foreclosure sale, Rhode Island law provides no

procedures for an accounting of the proceeds, nor a timeframe for a return of the funds to the former homeowner.  *See* R.I. Gen. Laws. §34-11-22.

c.)     <u>The Government's Interest</u>

The evaluation of the government's interest focuses on "the [governmental] function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *United States v. James Daniel Good Real Property*, *supra,* 510 U.S. at 56 (citing *Mathews v. Eldridge*, 424 U.S. at 335).   In the instant case, the governmental function at issue is the action by the FHFA and Fannie Mae to foreclose on owner-occupied residential mortgages.   In a broader context, the government function at issue is maintaining the stability of the national housing finance markets in general, and the stability of Fannie Mae in particular.  This function was articulated in the Housing and Economic Recovery Act of 2008 ("HERA"), the legislation that created the FHFA.  Section 1102 of HERA sets forth the duties of the Director of the FHFA as follows:

> (1) Principal duties.—The principal duties of the Director shall be—
> (A) to oversee the prudential operations of each regulated entity; and
> (B) to ensure that—
> (i) each regulated entity operates in a safe and sound manner, including maintenance of adequate capital and internal controls;
> (ii) the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities);
> (iii) each regulated entity complies with this title and the rules, regulations, guidelines, and orders issued under this title and the authorizing statutes;
> (iv) each regulated entity carries out its statutory mission only through activities that are authorized under and consistent with this title and the authorizing statutes; and
> (v) the activities of each regulated entity and the manner in which such regulated entity is operated are consistent with the public interest.

12 U.S.C. §4513(a)(1).

31

The government's function of maintaining the financial stability of Fannie Mae requires Fannie Mae to collect money from borrowers whose mortgages it owns.  In some cases, those collection efforts may include foreclosure.  However, alternatives to foreclosure, including a modification of the mortgage loan, a repayment plan, a short sale, a deed in lieu of foreclosure, or other alternatives, often result in a higher net present value to Fannie Mae than foreclosure and, therefore, more faithfully support the government's function of providing stability to Fannie Mae.  Legal scholars have documented that investors such as Fannie Mae suffer greater financial losses because mortgage servicers make more money from foreclosing than by entering into loan modifications:

> Unlike investors, servicers do not necessarily lose money from a foreclosure for less than the outstanding balance of the loan. Indeed, servicers have seen their profitability per loan rise in the last year as losses to investors from foreclosures have skyrocketed. Servicers can make more money from foreclosing than from modifying.  Servicers can also make more money by making short-term, unsustainable payment agreements than they can by making long-term, sustainable modifications. Because servicers can make more money from foreclosing than modifying, and more money from short-term, unsustainable payment agreements than sustainable, permanent modifications, servicers have strong incentives not to modify. The result is that servicers often do not modify or choose modifications that benefit themselves, harming both homeowners and investors.

> Diane E. Thompson, *Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications*, 86 Wash. L. Rev. 755, 771-72 (2011).

The government function of maintaining the stability of Fannie Mae and the national housing finance market is, thus, supported rather than hindered by adding procedures that encourage loss mitigation rather than foreclosures.  Both Fannie Mae and FHFA have stated publicly and repeatedly that foreclosure alternatives are preferable to foreclosure:

> According to FHFA and the Enterprises [Freddie Mac and Fannie Mae], foreclosing upon a mortgage generally results in a greater credit loss than does sustaining a mortgage through a foreclosure alternative. Thus, the servicers' failure to properly manage delinquent mortgages likely resulted in foreclosures in cases in which foreclosure alternatives would have served better the interest of the Enterprises and, by extension, the taxpayer.

32

FHFA Office of the Inspector General Evaluation Report, <u>FHFA's Oversight of the Servicing Alignment Initiative</u>, February 12, 2014, available at http://fhfaoig.gov/Content/Files/EVL-2014-003.pdf, attached to the Complaint as Exhibit 6 at Page 10.

During these years, these same government agencies together with the Enterprises and other market participants undertook a series of efforts to help families avoid foreclosure through loan modification programs and foreclosure alternatives. For FHFA and the Enterprises, these efforts directly relate to the "preserve and conserve" mandate because such activities are designed to reduce credit losses on mortgages originated primarily in the years before conservatorship. In addition, these efforts are consistent with FHFA's other mandates, including the EESA [Emergency Economic Stabilization Act of 2008] mandate to maximize assistance for homeowners. Since conservatorship began, the Enterprises have completed more than two million foreclosure prevention actions, including more than one million loan modifications.

FHFA, A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending (February 21, 2012), available at http://www.fhfa.gov/webfiles/23344/StrategicPlanConservatorshipsFINAL.pdf

Defendants will likely argue that the government's interest in foreclosing on Plaintiff's mortgage is analogous to the government's *ex parte* seizure of real property for purposes of collecting revenue to fund the government, a practice upheld in cases decided more than a century ago such as *Springer v. United States,* 102 U.S. 586, 593-594 (1881) and *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272 (1856).  However, here, the government is not collecting money to fund its operations, but, rather, to stabilize Fannie Mae, a government chartered corporation.   As demonstrated above, foreclosures can be more costly to investors such as Fannie Mae (and by extension, the federal government) than alternatives such as loan modifications, and the government could lose more money if alternatives to foreclosure are not fully evaluated.  As with the government's practice of conducting *ex parte* forfeitures that the Supreme Court ruled violated the due process clause, in *United States v. James Daniel Good Real Property*, "neither is there a plausible claim of urgency today to justify the summary seizure

of real property [without a hearing prior to a foreclosure]." *United States v. James Daniel Good Real Property*, *supra*, 510 U.S. at 61.

Nor would requiring FHFA and Fannie Mae to conduct a hearing prior to a foreclosure sale impose any undue administrative burdens.  Other federal agencies who administer residential mortgage programs routinely require a hearing before proceeding to foreclosure.  For example, the United States Department of Agriculture, to administer single family residential loans offered directly by the Rural Housing Service (formerly called the Farmers' Home Administration), notifies borrowers in the notice of default that they have a right to request an informal review of the decision to foreclose, appeal the decision, and engage in mediation services to challenge and resolve the issues. *See* 7 CFR 3550.4; Centralized Servicing Center Handbook HB-2-3550 Paragraph 1.9 available at

http://www.rurdev.usda.gov/SupportDocuments/3550-2chapter01.pdf.

Moreover, courts consistently have required a hearing prior to a foreclosure where the federal government is the foreclosing party. *See, e.g., Johnson v. United States Dept. of Agriculture*, 734 F.2d 774, 782-784 (11th Cir. 1984) (reversing denial of motion for preliminary injunction involving a due process and equal protection challenge to a foreclosure of loan made by the Department of Agriculture through the Farmer's Home Administration, now called the Rural Housing Service); *Lisbon Square v. United States*, 856 F. Supp. 482, 489 (E.D. Wis. 1994) ("By offering a mortgagor [on a HUD insured mortgage] a chance to explain the failure to make mortgage payments, HUD provides all of the due process required by the Fifth Amendment."); *United States v. Ford*, 551 F. Supp. 1101, 1105 (N.D. Miss. 1982) (**"**It is well settled that the Due Process Clause of the fifth amendment mandates that FmHA provide mortgagors with adequate notice and opportunity for a hearing before foreclosure of an FmHA home loan.");

*Ricker v. United States*, 417 F. Supp. 133, 139 (D. Me. 1976) ("The [mortgagees] should have

been afforded . . . written notice of the impending foreclosure, informing them that they were

entitled to a hearing at which they could challenge both the legal right of FmHA to foreclose and

the propriety of the decision to do so.") Finally, the Supreme Court's observation in the *ex parte*

forfeiture is equally applicable here: "[A]ny harm that results from delay is minimal in

comparison to the injury occasioned by erroneous seizure." *United States v. James Daniel Good

Real Property*, *supra*, 510 U.S. at 59.

Therefore, the actions of Fannie Mae are subject to the Constitution, and Fannie Mae

must provide a meaningful hearing before conducting a foreclosure of a person's primary

residence to comply with the Due Process Clause of the Fifth Amendment.


## II.     Plaintiffs Will Suffer Irreparable Harm If the Injunction is Denied

The harms resulting from a foreclosure sale and subsequent eviction are, undoubtedly,

irreparable.  Should Defendants proceed with the eviction of the Plaintiffs, they will become

homeless, as they have no other place to live.  See Boynton Decl. at ¶ 11. The threat of

homelessness is irreparable. *Bolduc v. Beal Bank, SSB*, 994 F.Supp. 82, 96-97 (D.N.H. 1998)

(where foreclosure may render defaulting borrowers homeless the resulting harm is irreparable).

Moreover, the sale of Plaintiffs' property by Fannie Mae and FHFA also constitutes irreparable

harm as "[r]eal estate has long been thought unique, and ... [its loss is] likely to be found

'irreparable.'" *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).  *See also

Shammas v. Merchants Nat'l Bank*, 1990 WL 354452, at *5 (D. Mass. 1990) ("sale [of real

property] is almost always irreparable harm").

III.     **FHFA and Fannie Mae Will Suffer Minimal Hardship If the Injunction is Granted**

In sharp contrast to the harm to Plaintiffs, Defendants FHFA and Fannie Mae will suffer little harm if injunctive relief is granted. The only harm suffered is the investor's delay in liquidating their investment.  This kind of delay does not tip the balance in favor of FHFA and Fannie Mae.  *See Bolduc v. Beal Bank, SSB*, 994 F.Supp. 82, 97 (D.N.H. 1998).  ("Little harm would result to the defendant [foreclosing financial institution] from the granting of a preliminary injunction, since it would merely delay the possible foreclosure sale of the properties until the resolution of the matter.").  While "[t]here is some opportunity cost associated with this delay . . . that cost is modest alongside the considerable, as well as irreparable, harm that plaintiffs' would experience were the motion denied." *Id.  See also In re: Mortgage Foreclosure Cases*, Misc. 11-mc-88-M-LDA, slip. op. 12 (D.R.I. July 23, 2012) ("The Court believes that any injury caused by delaying foreclosure is outweighed by the positive outcome that may be had in the event that an acceptable resolution can be obtained.")  This harm can be overcome through the payment of a reasonable use and occupancy fee, which was a condition imposed on borrowers for the injunction against foreclosures and evictions recently vacated by the District Court in *In re: Mortgage Foreclosure Cases*, Misc. 11-mc-88-M-LDA, slip. op. 8 (D.R.I. September 3, 2013).

In fact, the investor may actually benefit by granting the injunction. As the former homeowner, Plaintiffs have protected and will continue to protect the property against waste at their own expense, including heating it in the winter, protecting it from vandalism, and performing maintenance as necessary. Also, Plaintiffs are seeking an economically feasible alternative to foreclosure in good faith, which will likely provide Fannie Mae with a greater financial benefit than a liquidation.   *See* Discussion, *supra*, at 32-34.

IV.     **The Public Interest Favors Granting a Preliminary Injunction**

The public interest would be furthered by enjoining Defendants FHFA and Fannie Mae

from evicting Plaintiffs and/or transferring title to the Property pending a hearing on the merits.

Recognizing the magnitude of the foreclosure crisis, the District Court for the District of Rhode

Island established a special docket of cases challenging the propriety of foreclosures conducted

by mortgagees.  In doing so, the District Court has repeatedly observed that the public interest

was best served by staying proceedings and allowing the parties the opportunity to explore

alternatives to foreclosure:

> Plaintiff homeowners are confronted with the emotional and economic devastation of
> losing their homes to foreclosure.  Defendant financial institutions are confronted with
> mortgages on which homeowners have stopped paying.  . . . The Court's establishment of
> a system to explore all possibilities for the potential settlement of these claims before any
> party incurs any further expenses, burdens and/or risks of litigation is in the interest of all
> parties.
>
> *In re: Mortgage Foreclosure Cases*, Misc. 11-mc-88-M-LDA, Amended Order 1  (D.R.I.
> March 29, 2012).
>
> The Court finds, based on its experience managing these cases that the public's interest
> will be served by giving the parties the chance to resolve their differences before
> embarking into contentious and complicated litigation.
>
> *In re: Mortgage Foreclosure Cases*, Misc. 11-mc-88-M-LDA, slip. op. 12-13 (D.R.I. July
> 23, 2012)

The requested injunction is also consistent with the recent state-wide foreclosure

mediation legislation, R.I. Gen Laws §34-27-3.2, effective September 13, 2013.  The law

contains the following statement of public policy:

> (a) Statement of policy. It is hereby declared that residential mortgage foreclosure
> actions, caused in part by unemployment and underemployment, have negatively
> impacted a substantial number of homeowners throughout the state, creating a
> situation which endangers the economic stability of many of the citizens of this
> state, as the increasing numbers of foreclosures lead to increases in unoccupied and

unattended buildings and the unwanted displacement of homeowners and tenants who desire to live and work within the state.

The granting of the requested injunction will contribute to the economic stability of the State of Rhode Island by allowing Plaintiffs to remain in their home, such that the Property does not become unoccupied and unattended, and will avoid the displacement of the Plaintiffs.

## **CONCLUSION**

The actions of Defendants FHFA and Fannie Mae, including depriving Plaintiffs of their Property through foreclosure, are subject to the Due Process Clause of Fifth Amendment to the United States Constitution.  Because Plaintiffs stand to lose a significant property interest, and the government's interest in foreclosure is slight, additional procedures, including an evidentiary hearing, are required before the Defendants deprive Plaintiffs of their Property.

The Court should enter a preliminary injunction because Plaintiffs have demonstrated a significant likelihood of success on the merits of their claims.  Further, the balance of hardships favors Plaintiffs, and the public interest favors requiring additional procedures before the federal government may foreclose on a person's primary residence.

Wherefore, Plaintiffs respectfully request the court to enter an order enjoining the Defendants from conducting a foreclosure sale on the Property, pending further order of the Court.

Respectfully submitted,

Nancy A. Boynton and
Patricia Beekes
By Their Attorneys,

/s/ Jeffrey C. Ankrom
Jeffrey C. Ankrom, Esq. (#7663)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 138
(401) 453-0310 fax
jankrom@rils.org


/s/ Steven Fischbach
Steven Fischbach, Esq. (#3259)
Rhode Island Legal Services
56 Pine Street, Suite 400
Providence, RI, 02903
(401) 274-2652, ext. 182
(401) 453-0310 fax
sfischbach@rils.org

Dated: August 20, 2015